# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| BRUCE ROUSE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CASE NO. 5:17-CV-228 (MTT) |
| | ) |
| THE KROGER COMPANY d/b/a | ) |
| KROGER FOOD STORES, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## ORDER

The Plaintiff, Bruce Rouse, filed this action against his former employer, The Kroger Company d/b/a/ Kroger Food Stores, asserting claims for discrimination and retaliation under the Americans with Disabilities Act ("ADA").  Doc. 1.  Kroger moves for summary judgment on both claims and partial summary judgment on Rouse's claim for backpay.  Doc. 17.  Kroger also moves to strike Rouse's summary judgment "evidence."  Doc. 28.  For the reasons discussed below, Kroger's motion for summary judgment (Doc. 17) is **DENIED**, its motion for partial summary judgment (Doc. 17) is **GRANTED**, and its motion to strike (Doc. 28) is **DENIED as moot**.

## I. BACKGROUND[1]

Rouse worked at Kroger from 1983 until 2015.  Docs. 24 at 24:24-25; 25 at 9:23-10:1.  In 1995, Rouse was promoted to co-manager and worked as a co-manager in several stores until he was terminated in 2015.  Docs. 17-4 at 71:5-7; 17-7 at 80:15-18; 17-20; 24 at 26:22-27:1, 28:12-17.

---

[1] Unless stated otherwise, the facts are undisputed.  The facts are viewed in the light most favorable to Rouse.

In October 2013, Rouse hurt his back while lifting and carrying "shippers."[2]  Doc. 17-4 at 72:15-73:2.  In November 2013, Rouse's doctors placed him on restrictions and as a result, Kroger temporarily assigned Rouse to "Transitional Light Duty" work, such as completing administrative tasks, greeting customers, and performing human resources duties, and he was not asked to lift more than twelve pounds.  Docs. 17-4 at 71:5-14, 98:14-99:1; 17-6; 17-7 at 54:25-55:25; 17-10 at 3-4.

In June 2014, Rouse underwent surgery for his injury and was transferred, at his request, to a store closer to his residence.  Docs. 17-14 at 68:7-9; 17-15.  Three weeks after his surgery, Rouse was allowed by his doctors to do "sedentary, light duty" work, with restrictions of lifting no more than ten pounds from the floor to his waist and no more than twelve pounds from his waist to his head, and carrying no more than two pounds.  Docs. 17-4 at 110:9-18; 17-10 at 3-4; 17-11 at 15.  Rouse was aware that this light duty work was only temporary.  Doc. 17-4 at 94:24-95:3.

In March 2015, Rouse underwent a Functional Capacity Evaluation ("FCE") to determine whether he could return to work as a co-manager and what tasks he could complete without jeopardizing his health.  Doc. 17-11.  The FCE stated, by way of history, that Rouse had reached maximum medical improvement and that Rouse wished "to continue in [his] regular job[,] asking for help when necessary.  He feels he can perform the management duties with precaution for the lifting and product material handling."  *Id.* at 10; Doc. 17-12 at 2, 4.  Although Rouse could not complete the physical demands for a job with the requirements of a "medium physical demand

---

[2] Shippers are large quantities of a product sent to stores that are often sent with a cardboard display for employees to build and place the products.  Docs. 17-4 at 44:19-45:25; 17-7 at 78:18-79:23.  Shippers can weigh more than ten pounds, depending on the product.  Doc. 21-5 at 79:1-9.

capacity level," the FCE concluded he could return to his job at a "Modified Physical Demand level." Doc. 17-11 at 15. This meant that Rouse could lift ten pounds floor to waist, lift twelve pounds waist to head, and carry two pounds, for up to a third of his workday. *Id.* He could also "lift five pounds waist to floor, seven pounds waist to crown, carry ten pounds work over head, climb stairs and sit," for up to two-thirds of his workday. *Id.* All medical forms, including the FCE, were sent to Kroger.[3] Docs. 17-4; 22-1 at 128:22-129:4.

Thereafter, Rouse continued working as a co-manager within his permanent restrictions without, according to his supervisors and him, any problems or complaints by Kroger. Docs. 17-4 at 154:21-155:9; 17-16 at 52:11-15. Indeed, at all times after his return to work, Kroger never required Rouse to perform any task that would violate his medical restrictions after his injury and surgery, despite Kroger listing "lifting items in excess of 20 lbs." as an essential job function in its official co-manager job description and previous co-managers testifying that lifting was a normal part of their workday. Docs. 17-4 at 73:9-11, 95:11-13; 17-18 at 3-6. Rouse testified that after his injury, he would ask his co-workers for assistance when he needed help lifting items weighing more than ten pounds,[4] and there is no record of any of his co-workers ever complaining about assisting him. Docs. 17-4 at 154:21-155:9; 17-16 at 52:11-15. The only complaint made was by Manager Frank Wilder, who stated to Rouse's supervisor, Unit Manager Pat Mathes, that Rouse needed to "pull[] his load a little bit more." Doc.

---

[3] All medical forms were sent to Kroger and Sedgwick, the company that handled Rouse's workers' compensation claim. Docs. 17-4; 22-1 at 66:5-15, 111:16-114:19, 129:2-4; *see* Doc. 17-12 at 4.

[4] There is only one recorded instance where Rouse asked another person for help with lifting, and that person was not an employee of Kroger, but rather a third-party truck driver delivering a load to the store. Doc. 17-16 at 34:3-12. Therefore, there is no indication that this instance affected Kroger in any way. *See id.*

17-16 at 36:4-10. Kroger also scheduled Rouse to work the "most desirable" midday shift, when more employees would be available if he needed assistance. *Id.* at 34:18-36:3. Mathes believed scheduling Rouse to only work this shift was "unfair," but doing so did not violate Kroger's policies, and there is no evidence this reassignment caused Kroger problems. *Id.* at 37:10-39:17.

On July 6, 2015, Rouse was called to a meeting with Kroger's Associate Labor Relations Specialist Darryl Huff and District Human Resources Manager Latoya Bush. Docs. 17-7 at 68:3-7; 17-17 at 131:17-23; 24 at 100:2-14. Rouse did not know the reason for the meeting. Doc. 24 at 99:9-100:18. According to Rouse, Huff reviewed Rouse's FCE report outlining his restrictions, and then Rouse was told he was terminated. *Id.* at 100:20-24. When Rouse returned to his store after his meeting and told his supervisor, Mathes, that he had been terminated, Mathes became visibly upset and told Rouse that he "didn't understand" why Rouse had been fired. Doc. 21-1 at 108:4-13.

Kroger describes the meeting differently. According to its brief, "[a]fter an exhaustive yet fruitless search of available positions at Kroger and an interactive meeting discussing the physical demands of [Rouse's] position and his permanent restrictions, Kroger had no choice but to terminate [Rouse's] employment." Docs. 17 at 1; 17-22 ¶¶ 3, 4, 19; 17-7 at 80:15-19; 17-17 at 130:17-131:23; 17-20. The actual record of the meeting puts it differently yet:

> **Summarize the content of the meeting including all requests or suggestions made by the associate regarding their return to work.** On July 6, 2015, Darryl [Huff] and [Latoya Bush] had a conversation with Bruce Rouse concerning his permanent restrictions. We informed Bruce

>that Kroger was not able to accommodate his permanent restrictions and his last day of work would be today.

Doc. 17-12 at 2.

Since that time, Rouse has not sought additional employment, other than "talk[ing] to [his] brother" about possibly starting a business. Docs. 17-4 at 16:10-14; 21-1 at 140:19-142:21.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (emphasis in original). The moving party "simply may show . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 324).

In determining whether a genuine dispute of material fact exists, the Court must avoid weighing conflicting evidence or making credibility determinations. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to

be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A material fact is any fact relevant or necessary to the outcome of the suit, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### III. DISCUSSION

### A. Rouse's Discrimination Claim

The ADA forbids covered employers from discriminating against "qualified individual[s] with a disability because of the disability" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). Employers are required to provide reasonable accommodations for employees' known disabilities unless such accommodations would result in undue hardship to the employer. *Morisky v. Broward Cty.*, 80 F.3d 445, 447 (11th Cir. 1996) (citing 42 U.S.C. § 12112(b)(5)(A)).

The burden is on Rouse to establish a prima facie case of disability discrimination against his employer. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). To establish a prima facie case, Rouse must prove that (1) he has a disability; (2) he is a qualified individual under the ADA; and (3) he was subjected to unlawful discrimination due to his disability. *Id.* Once Rouse establishes a prima facie case, the burden of production shifts to Kroger to articulate a legitimate, nondiscriminatory reason for its alleged violation. *Calvo v. Walgreens Corp.*, 340 F. App'x 618, 624 (11th Cir. 2009). It is undisputed that Rouse was disabled within the meaning of the ADA, but Kroger contests the second and third prongs of Rouse's prima facie case of discrimination. *See generally* Docs. 17; 22; 29.

**1. Whether Rouse is a Qualified Individual under the ADA**

A "qualified individual" is an "individual with a disability who, with or without reasonable accommodation, can perform the *essential* functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). In other words, if the employee is unable to perform an essential function of his job, even with a reasonable accommodation, then he is not considered a qualified individual under the ADA. *Davis*, 205 F.3d at 1305 (citation omitted).

Whether a job function is essential is evaluated on a case-by-case basis by examining a number of factors. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1258 (11th Cir. 2007). Consideration is given to the employer's written description for the disabled employee's job and the employer's judgment as to whether a job function is essential. *See* 42 U.S.C. § 12111(8). Other factors for consideration include: (1) the amount of time spent performing the function; (2) the consequences of not requiring the employee to perform the function; (3) the work experience of former employees; (4) the current work experience of current employees in similar roles; and (5) the terms of the collective bargaining agreement ("CBA"), if available.[5] *See* 29 C.F.R. § 1630.2(n).

Rouse relies heavily on the Eleventh Circuit's unreported decision in *Calvo v. Walgreens*, 340 F. App'x 618 (11th Cir. 2009). *See generally* Doc. 22. In *Calvo*, the assistant manager of a Walgreens store, Mislehivy Calvo, was injured in a car crash

---

[5] In his response, Rouse relies on his declaration (Doc. 22-2) stating the terms of Kroger's CBA. *See generally* Doc. 22. Kroger objects to his reliance on the CBA because his declaration is inadmissible hearsay; because Rouse lacked personal knowledge of the contents of the CBA; and because the CBA was not admitted into evidence, and Rouse instead must rely on the "best evidence," or the actual CBA. Doc. 28 (citing Fed. R. Evid. 801(c), 1002). Because the Court can resolve the motion for summary judgment without resorting to the CBA, the motion to strike (Doc. 28) is **DENIED as moot**. However, the Court notes that Rouse makes excellent points and cites compelling case law (unlike Kroger in its motion to strike) regarding the CBA in his reply brief, buttressing the conclusion that issues of fact remain. *See generally* Doc. 30.

that required several surgeries on her arms, leaving her left arm and hand non-functional and permanently in a brace. 340 F. App'x at 620. Calvo was terminated by Walgreens for her inability to lift more than five pounds, and Calvo filed a complaint against Walgreens for discriminating against her on the basis of her disability. *Id.* Walgreens argued that lifting, pushing, and pulling items heavier than five pounds was an essential function of Calvo's job as an assistant manager. *Id.* Walgreens presented evidence of its assistant manager job description, which included twenty-three tasks—one of which required lifting. *Id.* Walgreens also cited Calvo's deposition testimony acknowledging that her job included "things like cleaning the restrooms and mopping the floors, unloading trucks," and the testimony of another manager that "carrying items was a regular part of the assistant manager's job." *Id.* at 622-23. On the other hand, one of Calvo's supervisors testified that Calvo's job performance was "fine" despite her inability to lift and that "other employees would help her carry items, and no one ever complained about it." *Id.* at 623. Another supervisor "ordered assistant managers working the afternoon shift, as Calvo did, to refrain from restocking and focus entirely on customer service." *Id.* Furthermore, Calvo had been working at Walgreens while disabled for over four years before she was terminated. *Id.* The Eleventh Circuit held that a genuine issue of material fact existed as to whether Calvo was a qualified individual under the ADA because there was a factual dispute as to whether lifting was an essential function of her job. *Id.*

Here, Kroger's co-manager job description weighs in its favor. Similar to the defendant's job description in *Calvo*, Kroger's co-manager job description lists "lifting bags of groceries that weigh as much as 20 lbs. and bags of merchandise, such as dog

-8-

food, that weigh as much as 50 lbs.;" stocking shelves from floor level to above shoulder level; and lifting "objects weighing as much as 50 lbs." as essential functions. Doc. 17-18 at 3-4. Of the nine essential functions listed, four require lifting. *Id.* But the employer's job description is not conclusive, and the remaining factors must be considered. *Calvo*, 340 F. App'x at 623; *see D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1233 (11th Cir. 2005).

To demonstrate how frequently co-managers are required to lift, Kroger relies on its "Physical Demand Analysis," which states that co-managers often lift eleven to twenty-five pounds on an hourly basis and twenty-six to fifty pounds on a daily basis. Doc. 17-18 at 5-6. Several former co-managers also testified that lifting was required regularly throughout a typical workday, and Rouse testified that prior to his injury, he lifted "up to 50 pounds" on a "regular basis." Docs. 17-7 at 44:23-45:19; 17-16 at 53:13-54:8; 17-22 ¶¶ 5, 6; 17-23 ¶¶ 5, 6; 22-1 at 83:12-84:24. On the other hand, a current unit manager—a role similar to the co-manager position—testified that her main duties were "straightening" the store, and she did not mention lifting anything appearing to be more than ten pounds. Doc. 17-16 at 11:10-16:3. Rouse also claims that lifting items above his post-injury weight restriction was not a "constant part of the job" before his injury. Doc. 22-2 ¶ 4.

But Rouse also stated that delegating tasks, such as lifting, to his subordinate coworkers was a "normal part of [his] job" before and after his injury, indicating, in the light most favorable to Rouse, that his restrictions did not negatively affect Kroger. Doc. 22-1 ¶¶ 22-24; *see generally* Doc. 22. However, the fact that Rouse delegated his lifting duties to other workers is exactly what Kroger maintains adversely affected the store by

food, that weigh as much as 50 lbs.;" stocking shelves from floor level to above shoulder level; and lifting "objects weighing as much as 50 lbs." as essential functions. Doc. 17-18 at 3-4. Of the nine essential functions listed, four require lifting. *Id.* But the employer's job description is not conclusive, and the remaining factors must be considered. *Calvo*, 340 F. App'x at 623; *see D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1233 (11th Cir. 2005).

To demonstrate how frequently co-managers are required to lift, Kroger relies on its "Physical Demand Analysis," which states that co-managers often lift eleven to twenty-five pounds on an hourly basis and twenty-six to fifty pounds on a daily basis. Doc. 17-18 at 5-6. Several former co-managers also testified that lifting was required regularly throughout a typical workday, and Rouse testified that prior to his injury, he lifted "up to 50 pounds" on a "regular basis." Docs. 17-7 at 44:23-45:19; 17-16 at 53:13-54:8; 17-22 ¶¶ 5, 6; 17-23 ¶¶ 5, 6; 22-1 at 83:12-84:24. On the other hand, a current unit manager—a role similar to the co-manager position—testified that her main duties were "straightening" the store, and she did not mention lifting anything appearing to be more than ten pounds. Doc. 17-16 at 11:10-16:3. Rouse also claims that lifting items above his post-injury weight restriction was not a "constant part of the job" before his injury. Doc. 22-2 ¶ 4.

But Rouse also stated that delegating tasks, such as lifting, to his subordinate coworkers was a "normal part of [his] job" before and after his injury, indicating, in the light most favorable to Rouse, that his restrictions did not negatively affect Kroger. Doc. 22-1 ¶¶ 22-24; *see generally* Doc. 22. However, the fact that Rouse delegated his lifting duties to other workers is exactly what Kroger maintains adversely affected the store by

food, that weigh as much as 50 lbs.;" stocking shelves from floor level to above shoulder level; and lifting "objects weighing as much as 50 lbs." as essential functions. Doc. 17-18 at 3-4. Of the nine essential functions listed, four require lifting. *Id.* But the employer's job description is not conclusive, and the remaining factors must be considered. *Calvo*, 340 F. App'x at 623; *see D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1233 (11th Cir. 2005).

To demonstrate how frequently co-managers are required to lift, Kroger relies on its "Physical Demand Analysis," which states that co-managers often lift eleven to twenty-five pounds on an hourly basis and twenty-six to fifty pounds on a daily basis. Doc. 17-18 at 5-6. Several former co-managers also testified that lifting was required regularly throughout a typical workday, and Rouse testified that prior to his injury, he lifted "up to 50 pounds" on a "regular basis." Docs. 17-7 at 44:23-45:19; 17-16 at 53:13-54:8; 17-22 ¶¶ 5, 6; 17-23 ¶¶ 5, 6; 22-1 at 83:12-84:24. On the other hand, a current unit manager—a role similar to the co-manager position—testified that her main duties were "straightening" the store, and she did not mention lifting anything appearing to be more than ten pounds. Doc. 17-16 at 11:10-16:3. Rouse also claims that lifting items above his post-injury weight restriction was not a "constant part of the job" before his injury. Doc. 22-2 ¶ 4.

But Rouse also stated that delegating tasks, such as lifting, to his subordinate coworkers was a "normal part of [his] job" before and after his injury, indicating, in the light most favorable to Rouse, that his restrictions did not negatively affect Kroger. Doc. 22-1 ¶¶ 22-24; *see generally* Doc. 22. However, the fact that Rouse delegated his lifting duties to other workers is exactly what Kroger maintains adversely affected the store by

taking workers away from their assigned tasks, although it presents no actual evidence that it experienced such a negative effect. Doc. 17 at 7-8.

Kroger relies on *Medearis v. CVS Pharmacy, Inc.* and argues that the facts in *Medearis*, compared to *Calvo*, are more "analogous" to Rouse's case. Doc. 29 at 6 (citing 646 F. App'x 891 (11th Cir. 2016)). *Medearis* found that the plaintiff had no evidence that anyone in his position was able to perform his job "for an extended period of time without being able to lift more than 10 pounds," and lifting was thus an essential function of his job. 646 F. Supp. 3d 1294, 1307 (N.D. Ga. 2015), *aff'd sub nom.* 646 F. App'x 891. Kroger admits that *Medearis* distinguished *Calvo* because "[o]ne of the most important facts noted by the [*Calvo*] court in making its finding was that" Calvo's supervisor said that Calvo completed her tasks post-injury "fine," which was not the case in *Medearis*. *Id.* at 1307; Doc. 29 at 6.

But that is the case here. Rouse's last review with Kroger shows that Rouse's job performance met or exceeded his subordinates' and supervisors' expectations. Doc. 17-14 at 17. And as in *Calvo*, no worker ever complained about assisting Rouse with lifting. Doc. 17-16 at 33:19-34:12; 340 F. App'x at 623. Most importantly, once Rouse's permanent restrictions were assigned, he said he performed his regular duties with no problems, and it seems his supervisor, Mathes, agreed. Docs. 17-4 at 154:21-155:9; 17-16 at 52:11-15; *see* Doc. 21-1 at 108:4-13.

In short, the facts matter in this fact-intensive analysis, and here, the facts are in dispute. Specifically, there is a factual dispute as to whether requiring Rouse to lift more than ten pounds—which Kroger maintains is an essential function of the co-manager position—negatively affected Kroger. Viewed in the light most favorable to

Rouse, there is a genuine issue of material fact regarding whether lifting more than ten pounds is an essential function of the co-manager position, and, thus, whether Rouse is a qualified individual. *Calvo*, 340 F. App'x at 623.

### 2. Whether Rouse Was Subjected to Unlawful Discrimination

Rouse claims that Kroger unlawfully discriminated against him by failing to reasonably accommodate his disability. Doc. 1 ¶ 26. It is unlawful for an employer to fail to provide a reasonable accommodation for a qualified individual under the ADA, unless the employer demonstrates "that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *D'Angelo*, 422 F.3d at 1225-26. The plaintiff must identify a reasonable accommodation that the employer should have made. *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998). However, an employer is not required to give an employee his choice of accommodation. *Medearis*, 646 F. App'x at 895 (citation omitted). Reasonable accommodations may include "job restructuring," reassignment to a vacant position, or "part-time or modified work schedules." 42 U.S.C. § 12112(9)(B). "[T]he ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal* functions." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) (emphasis added). But "[a]n employer is required neither to create and fund a position as an accommodation nor re-allocate job duties in order to change an *essential* function." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (emphasis added). Kroger argues that (1) Rouse never made a "specific" request for an accommodation, and (2) an accommodation allowing Rouse to request assistance with

lifting is unreasonable because employers are not required to reallocate job duties to change an *essential* function. Doc. 17 at 14-15.

Kroger's first argument is patently without merit; indeed, it is refuted by its own version of the facts. The FCE states explicitly that Rouse had reached "maximum medical improvement" and that he wanted to continue to work with his permanent restrictions. Doc. 17-11 at 2, 10. Once Kroger received a copy of the FCE,[6] which Huff says he reviewed with Rouse, Kroger had "enough information to know of both [Rouse's] disability and desire for an accommodation, or circumstances [were] at least . . . sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation." *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) (internal quotation marks and citations omitted). Therefore, there is, at the very least, a factual dispute as to whether Rouse requested an accommodation.

Kroger's argument that it is not required to reallocate job duties to change an *essential* function turns on its disputed assertion that lifting more than ten pounds is an essential function of his job.[7] Doc. 17 at 11 (citing *Earl*, 207 F.3d at 1367). Because there is a genuine issue of material fact as to whether lifting more than ten pounds is an essential function, the Court cannot conclude as a matter of law that Kroger did not fail

---

[6] Other district court cases have held that providing a doctor's letter with restrictions, such as Rouse's FCE communicated to Kroger, constitutes a request for a reasonable accommodation. *E.g.*, *Roundtree v. Florida*, 2015 WL 3756811, at *4-5 (M.D. Fla. 2015) (citing *Molina v. D.S.I. Renal, Inc.*, 840 F. Supp. 2d 984, 1001-02 (W.D. Tex. 2012)).

[7] Employers may be required to restructure a job by altering or eliminating some of its *marginal* functions to accommodate a disabled employee. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).

to reasonably accommodate his disability. Accordingly, Rouse has established a prima facie case of disability discrimination.

### 3. Whether Kroger Has Articulated a Legitimate, Nondiscriminatory Reason for Its Alleged Discriminatory Action

Once a plaintiff establishes a prima facie case under the ADA, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its alleged discriminatory action. *Calvo*, 340 F. App'x at 624 (citing *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (holding that the employer's failure to produce evidence that it did not hire the plaintiffs for a nondiscriminatory reason, such as insufficient qualifications, was not a legitimate, nondiscriminatory reason)). If the employer meets its burden of production, the presumption of discrimination is rebutted, and "the plaintiff must [then] introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981); *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks and alteration omitted).[8]

Kroger does not argue that it terminated Rouse for some legitimate, nondiscriminatory reason unrelated to his disability. Doc. 17 at 16-17. Rather, Kroger argues Rouse was terminated because of his disability and its inability to accommodate him.[9] *Id.* This is not a legitimate, nondiscriminatory reason entitling Kroger to summary judgment. In any event, as discussed above, there is a question of fact with regard to

---

[8] ADA retaliation claims are analyzed under the same framework used in Title VII retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

[9] Kroger's proffered legitimate, nondiscriminatory reason for Rouse's termination, on which it has the burden, is, effectively, that Rouse is not a qualified individual—an issue on which Rouse bears the burden. It is not clear why Kroger would want to assume a burden it is not required to shoulder.

-13-

whether Kroger was unable to accommodate his permanent restrictions. Accordingly, summary judgment is **DENIED** on Rouse's discrimination claim.

**B. Rouse's Retaliation Claim**

Rouse argues that his March 2015 request for accommodations—as stated in the FCE and discussed at the July meeting during which he was fired—constituted protected activity and that Kroger fired him because of that request.[10] Docs. 1 ¶ 36; 22 at 16. To establish a prima facie case of retaliation, Rouse must prove that (1) he participated in an activity protected by the ADA; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *Pipkens v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) (citation omitted).

Rouse's request for accommodations constitute statutorily protected activity. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). As for the second element, termination is "clearly [an] adverse employment action." *McCray v. Wal-Mart Stores, Inc.*, 377 F. App'x 921, 923 (11th Cir. 2010) (citing 42 U.S.C. § 2000e). The third element, causation, may be proven by direct evidence, circumstantial

---

[10] Rouse also argues—and Kroger does not dispute—that his June 2014 request for a shorter driving distance constituted a request for an accommodation, which Kroger granted. Docs. 17 at 13-16; 22 at 16-18. But there is clearly no connection between that request and his termination. "[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action" must be "very close" to establish sufficient evidence of a causal connection in a prima facie retaliation case. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted). Kroger did not terminate Rouse until July 2015—more than twelve months after this request—which is not "close" enough to establish a causal connection. Docs. 17-11; 17-7 at 80:15-19; 17-17 at 130:17-131:23; 17-20; *Higdon v. Jackson*, 393 F.3d 1211, 1220-21 (11th Cir. 2004) (holding that three months was insufficient to establish a causal connection). There is no evidence that Kroger mentioned Rouse's June request in his termination meeting, so Rouse cannot provide direct evidence that his June request was the cause of his termination. *See Alsobrook v. Fannin Cty., Ga.*, 2015 WL 13541132, at *8 (N.D. Ga. 2015) (holding that an employer's statement that he was firing the plaintiff "due to her age" constituted direct evidence of the plaintiff's claim, which was sufficient to create a jury issue, and circumstantial evidence was not needed).

-14-

evidence, or statistical evidence. *Standard*, 161 F.3d at 1330. "The analytical framework and burden of production varies depending on the method of proof chosen." *Id.* "Direct evidence is evidence that establishes the existence of [a causal connection] behind the employment decision without any inference or presumption." *Id.* (citation omitted).

In its brief, Kroger assumes Rouse relies only on circumstantial evidence—a close temporal connection—to prove causation and thus analyzes his claim under the traditional burden-shifting test for causation evidence.[11] Doc. 17 at 18-22. Kroger argues that the temporal proximity between Rouse's March request for an accommodation and his July termination is not close enough to establish a causal connection. *Id.* at 19-21. But, when the evidence is viewed in the light most favorable to Rouse, he has adduced direct, and not just circumstantial, evidence of causation. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990). First, as discussed, Rouse requested accommodations when Kroger received a copy of Rouse's March 2015 FCE. Docs. 17-4; 22-1 at 128:22-129:4. Thereafter, he performed his job duties, he claims, with no difficulty. Doc. 17-4 at 154:21-155:9. Then, in July, Kroger fired him expressly because of his request for accommodations for his

---

[11] Additionally, Kroger relies on *Frazier-White v. Gee*, which held that the plaintiff did not establish a prima facie case of retaliation because the plaintiff "could not estimate when she would be able to return to full duty. She confirmed that she could not perform the *essential* duties of her [security officer] position, and she did not suggest any accommodations that would enable her to immediately resume full duty in any capacity." 818 F.3d 1249, 1252 (11th Cir. 2016) (emphasis added). *Frazier-White* is inapplicable to this case because the Eleventh Circuit's holding rested on the fact that the plaintiff could not perform the essential duties of her job, and, as discussed above, there is a factual dispute in this case as to whether lifting is an essential function.

restrictions as outlined in his FCE. Docs. 17-19 at 2; 17-20; 22 at 17. Kroger itself provided evidence of a causal connection between Rouse's FCE and his firing, when it stated that "the triggering event for the termination was [Rouse] being issued permanent restrictions." Doc. 29 at 10. Because there is direct evidence that Kroger fired Rouse because of his protected activity, Kroger is not entitled to summary judgment on Rouse's retaliation claim. *See Alsobrook v. Fannin Cty., Ga.*, 2015 WL 13541132, at *8 (N.D. Ga. 2015) (holding that an employer's statement that he was firing the plaintiff "due to her age" constituted direct evidence of the plaintiff's claim, which was sufficient to create a jury issue, and circumstantial evidence was not needed).

If a plaintiff has direct evidence of retaliation, then the employer "can avoid liability only by proving [at trial] that it would have made the same decision even if it had not allowed such discrimination to play a role." *Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995) (citation omitted).[12] Kroger, assuming Rouse relied on circumstantial evidence, argued that it had a legitimate, nondiscriminatory reason for firing Rouse. Doc. 17 at 22. But, again, because Rouse has direct evidence of retaliation, the relevant defense is whether Kroger can establish that it would have made the same decision to fire Rouse despite his request for an accommodation, and a jury must decide this issue. *Haynes*, 52 F.3d at 931 (citation omitted). In any event, Kroger proffers the same legitimate, nondiscriminatory reason in response to Rouse's retaliation claim that it proffered in response to Rouse's discrimination claim—it claims it fired Rouse because of his disability and its inability to accommodate him. Doc. 17 at

---

[12] The same proof is required and the same analytical framework is used under the ADA and 42 U.S.C. § 1981. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). *See also Stewart*, 117 F.3d at 1287 (noting that ADA retaliation claims are analyzed under the same framework used in Title VII retaliation claims).

16-17. That argument, for the reasons discussed, has no merit. Accordingly, summary judgment is **DENIED** on Rouse's retaliation claim.

**C. Backpay**

Kroger also moves for partial summary judgment on Rouse's claim for recovery of backpay. Docs. 1 ¶ 32; 17 at 18. The ADA allows employees to recover backpay if they exercise "reasonable diligence" in their attempts to find new employment. 42 U.S.C. §§ 12117, 2000e-5(g)(1). The burden is on the employer "to show that [an employee] did not make reasonable efforts to obtain comparable work, or that comparable work was available and the [employee] did not seek it out." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1379 (S.D. Fla. 1998) (citing *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1139 (5th Cir. 1988)). An employee's decision to start a business or "become self-employed may constitute reasonable diligence for purposes of the backpay determination." *Id.* (citations omitted). Although the self-employment endeavor does not require success, the employee must make "an honest, good faith effort" to secure employment. *Smith v. Great Am. Rests.*, 969 F.2d 430, 438 (11th Cir. 1992).

Kroger contends that Rouse cannot recover backpay because "he has not attempted to look for additional employment since his termination." Doc. 17 at 18 (citing Doc. 17-4 at 16:10-12 ("Q: What have you done since July of 2015 to look for employment? [Rouse]: I have not looked for employment.")). Rouse argues that he has "looked for several different business opportunities [with his brother] to create income," such as "a ServePro [sic] business, a floral shop and a gift shop."[13] Doc. 21-1 at

---

[13] Rouse also offers as an explanation for his failure to seek employment the fact that he was receiving workers' compensation benefits. Doc. 22 at 20. While that is an explanation, it is not an explanation that

140:19-142:21. However, Rouse stated in his deposition that he merely talked to his brother about starting a few businesses, but "it didn't work out" because his brother moved to another city. *Id.* In other words, Rouse did not take any actual steps to start a business, other than discussing the possibility with his brother. *See id.* This is not enough to show that Rouse made "an honest, good faith effort" to become self-employed. *See Smith*, 969 F.2d at 438. Rouse thus did not mitigate his damages and is not entitled to recover backpay. *Id.* Accordingly, Kroger's motion for partial summary judgment on Rouse's claim for backpay is **GRANTED**.

## IV.  CONCLUSION

Kroger's motion for summary judgment (Doc. 17) is **DENIED**, its motion for partial summary judgment (Doc. 17) is **GRANTED**, and Kroger's motion to strike (Doc. 28) is **DENIED as moot**. Rouse's discrimination and retaliation claims may proceed to jury, and his claim for backpay is **DISMISSED**.

**SO ORDERED**, this 16th day of November, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

helps him. That Rouse preferred to collect workers' compensation benefits rather than seeking work illustrates Kroger's point.